GILLHAM v. JENKINS et al.

No. 34338.   April 8, 1952.

Rehearing Denied May 6, 1952.

*244 P. 2d 291.*

Irving D. Ross and David Ross, Newkirk, and Bruce B. Potter, Blackwell, for plaintiff in error.

Felix C. Duvall, Ponca City, and Peyton E. Brown, Blackwell, for defendants in error.

GIBSON, J. This action was brought by C. J. Gillham, guardian of the estate of Sherman G. Peeples, an incompetent, against above named defendants, the owners of an oil and gas lease on 80 acres of land owned by the above-named incompetent. Plaintiff is seeking to recover a royalty one-eighth of the proceeds of all gas sold from a gas well drilled on said land by defendants.

The oil and gas lease was executed by plaintiff guardian on January 17, 1944. It contained a pooling or unitizing clause. The pertinent parts thereof follow:

"Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by the lease or any portion thereof with other lands, lease or leases in the immediate vicinity thereof, when in Lessee's judgment it is necessary or advisable to do so in order to properly develop and operate said lease premises so as to promote the conservation of oil, gas or other minerals in and under and that may be produced from said premises, such pooling to be of tracts contiguous to one another and to be into a unit or units not exceeding 40 acres each in the event of an oil well, or into a unit or units not exceeding 640 acres each in the event of a gas well. Lessee shall execute in writing and record in the conveyance records of the county in which the land herein leased is situated an instrument identifying and describing the pooled acreage. The entire acreage so pooled into a tract or unit shall be treated, for all purposes except the payment of royalties on production from the pooled unit, as if it were included in the lease. If production is found on the pooled acreage, it sh≥ll be treated as if production is had from this lease, whether the well or wells be located on the premises covered by this lease or not. In lieu of the royalties elsewhere herein specified, lessor shall receive on production from a unit so pooled only such portion of the royalty stipulated herein as the amount of his acreage placed in the unit or his royalty interest therein on an acreage basis bears to the total acreage so pooled in the particular unit involved.

"* * *

"All express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders,

Rules of Regulations, and this lease shall not be terminated, in whole or in part, nor lessee held liable in damages, for failure to comply therewith, if compliance is prevented by, or if such failure is the result of, any such Law, Order, Rule or Regulation."

Defendants commenced the drilling of a well intending to find oil and if necessary to drill to the Wilcox sand, estimated at a depth of 4,300 to 4,400 feet. The United States was then at war and its citizens were laboring under many government controls and regulations. The oil industry controls were, in part, embodied in order No. 11 of the P.A.W (Petroleum Administrator of War), which order was commonly referred to as P. A. O. 11. It was not terminated until the Presidential Order of May 8, 1946, and was in full force and effect during the events leading to this litigation. P. A. O. 11 permitted the drilling of an oil well on any tract of not less than 40 acres and a gas well on not less than 640 acres without action or permit of the Petroleum Administrator. Defendants' leasehold covered 80 acres, and no Federal permit was necessary for the drilling of an oil well. Defendants had on hand sufficient and necessary casing and other critical materials to drill the intended oil well, and they obtained no permit for the use of critical materials.

In June, 1944, defendants, while drilling for oil, encountered about 9,000,000 cubic feet of gas at 4,355 feet in a formation called Mississippi Chert. This volume of gas made the well a valuable well if defendants could market their gas. Here they encountered difficulties, as development of a gas well made it necessary for them to comply with the regulations and obtain a permit under P. A. O. 11 before the well could be equipped with the necessary critical materials to connect with a receiving gas line, and this was necessary before the gas could be taken by any purchaser. The Northern Oklahoma Gas Company, supplying two war plants at Ponca City, was anxious to purchase the gas, and it maintained a gathering pipe line approximately one-half mile from the well. Great effort was expended to obtain such permit.

P. A. O. 11 required a unit of not less than 160 acres for each gas well at this depth, as a condition precedent to the issuance of the necessary permit. An attempt was made to induce the Petroleum Administrator to make an exception, authorized on certain conditions under P. A. O. 11, and thus permit defendants to operate and produce from their 80-acre leasehold alone, by reason of the great need of gas in the war effort. Defendants' efforts were of no avail as Administrator refused to make the exception.

It therefore became necessary for defendants to unitize or pool their lease with some adjoining 80-acre lease if defendants and royalty owners were to receive any income from their valuable well. After many attempts to work out a pooling agreement with the holders of leases on adjoining tracts defendants negotiated a pooling agreement with Sun Oil Company, the owner of a lease on 80 acres directly to the north of the Peeples lease. This agreement provided that defendants would give the Sun Oil Company an undivided 1/16th of the proceeds of gas produced from their well, and it was agreed that defendants would cause another 1/16th of the proceeds to be paid to Sun's lessor, Fruits. This interest to the owner of the land under Sun's lease followed as an incident to the unitization authorized in defendants' lease, since the tracts so unitized were equal in area, unless plaintiff's contentions herein are to be upheld.

Plaintiff refused to sign a division order accepting a royalty share of 1/16th but demands payment of the full 1/8th of the production of gas.

Plaintiff contends that (1) the lease gives defendants no authority to pool with other lands after production has been discovered, and (2) the lease requires that in the event there is a pooling lessor shall share in the royalty

under the acreage with which his acreage is pooled.

Plaintiff cites and places chief reliance upon Thomas v. Ley, 177 Okla. 150, 57 P. 2d 1186, and Imes v. Globe Oil & Refining Co., 184 Okla. 79, 84 P. 2d 1106. The Thomas case approved the pooling, which was done before discovery of oil, and in the Imes case the pooling was done after the discovery and in that case the pooling arrangement was stricken down. Seizing upon this element of the time of execution of the pooling contracts with respect to production, plaintiff then cites several authorities relative to the construction of contracts.

Since it is conceded that production was had prior to the unitization, the Thomas case is of little aid in the consideration of this case. In the Thomas case, however, we held that the pooling contracts were fairly made, as originally intended by the owners and without unreasonable delay. Both of the cited cases dealt with the ordinary lease situation where all owners of lots or parcels in a given block were permitted to join in the lease. In neither case was there authority given to the lessee to pool acreage when deemed necessary or advisable in order to develop and operate as in the instant case.

In the Imes case the principal factor for consideration was not the time of development but it was the good faith of the lessees in combining additional lots to the unit after production was had. The fact of a prior discovery of oil was incidental to the proof of bad faith. Twenty-one lots were joined together in one lease, and two productive wells were drilled thereon. Later, the lessee, having acquired a lease on six additional lots in the area, attempted to bring them under the original lease. There was evidence that these six lots were condemned for oil and gas purposes. The joinder of these additional lots served no purpose and added nothing to value of the unit. It did serve to increase the interest of lessee in the oil and gas already being produced and to decrease the proportionate share of lessors. It appeared that the addition of the six lots was not made in good faith. The lessee sought to enrich himself at the expense of the lessor. The case is clearly distinguishable from the present case, where a real necessity and purpose existed at the time of the pooling, which was done in good faith to obtain the marketing of the gas from the well on plaintiff's land, and where the unitization was had, under compulsion, if the gas was to be marketed and benefit obtained by either party.

The lease indicates that the parties contracted with reference to the wartime conditions and regulations then in existence. It specifically provides that all express or implied covenants of the lease shall be subject to all Federal and State laws, executive orders and rules or regulations. The wording of the pooling clause is broad enough to cover and authorize defendants to do what was done in the case. The granted authority to lessees to pool with other acreage, when in their judgment it becomes necessary or advisable "in order to properly develop and operate said leased premises", gave defendants the right to combine and pool even after discovery of gas, when we take into consideration the wartime conditions and circumstances then existing. Lessees had developed to the extent of discovery. But they had bound themselves to "operate" the leased premises, and such operation would include the marketing of the discovered product. In order to so operate they were under compulsion to unitize with other adjoining acreage until there existed a unit of at least 160 acres. At that stage of the proceedings a refusal to unitize would have meant abandonment of the entire project. At that time lessees were bound to act in good faith. Otherwise they would have come within the doctrine of the Imes case.

The trial court found that under the lease the defendants had not only the right but under existing conditions they had the duty to unitize with other acreage, and further found that their acts

were done in good faith and fair dealing and within a reasonable time. We find that the evidence supports such findings.

The trial court was confronted with the interpretation of the contract of the parties. In the interpretation of a contract the mutual intention of the parties as it existed at the time of the contract is a paramount objective. The circumstances under which the contract was made and the subsequent acts and conduct of the parties may be considered in arriving at the intention. Tit. 15 O. S. 1951 §§152 and 163; D'Yarmett v. School District No. 27, etc., 72 Okla. 124, 179 P. 20; Anthis v. Sullivan Oil & Gas Co., 83 Okla. 86, 203 P. 187; Tyer v. Caldwell, 114 Okla. 13, 242 P. 760; Perry Journal Co. v. Shaw, 204 Okla. 479, 231 P. 2d 369.

The parties, in entering into the lease contract, intended that the premises would be developed for oil and gas, and if production were obtained it was further intended that the lease should be operated in such a manner as to permit the production to be marketed and sold to the financial benefit of the contracting parties. They intended that the acreage should be pooled with other acreage if necessary or advisable, and they further intended to comply with the law including the wartime rules and regulations of the Federal Government with respect to the development and operation of their mutual undertaking. We hold that the trial court was correct in its decision that, under all the circumstances of this case, it was the duty of lessee to pool or combine the involved acreage with other acreage in order to comply with the necessary Federal rules and regulations and thus secure a market for the production.

But plaintiff says that assuming the defendants had the right to pool the land after production the manner in which they attempted to pool violates provisions of the lease. Plaintiff says that the lease requires that in the event of pooling the lessor shall share in the royalty under the acreage with which his acreage is pooled. He then attacks the validity of defendants' contract with Sun Oil Company. We have examined the contract and think it was fair. It limited the pooling agreement to the one sand at the Mississippi Chert horizon. If oil were discovered on plaintiff's lands or if gas was found in some sand other than the one found in the Peeples lease, there was no unitization as to such production. The parties recognized the contract as a necessary expedient to meet the Federal regulations. The contract provided that it was a unitization of both 80-acre tracts covering and including only the gas rights to Mississippi Chert. Plaintiff says that under the contract he cannot participate in royalty under the Sun 80 acres.

There is no evidence in this record to establish whether or not the Peeples well drained gas from the Sun acreage. In so far as the record reveals there is such a drainage. The Federal requirements of a minimum of 160 acres to each gas well at this level would indicate that such requirement is based upon the principle that one such gas well will drain from 160 acres. Suffice it to say that there is no competent evidence to negative the fact of drainage from the entire unit. Hence this proposition of plaintiff must fall for want of proof. The contended diminution of plaintiff's royalty from 1/8th under 80 acres to 1/16th under 160 acres may or may not be a diminution in fact. But if there is a diminution it arises by the fact of unitization, and such unitization was authorized in the lease. The lease specifically provided that in the event of pooling the lessor shall receive on production of the unit so pooled only such portion of the royalty stipulated as the amount of his acreage bears to the total pooled acreage.

Plaintiff says the contract is unfair to him in that he had to give up 1/16th of the royalty and defendants gave only a like amount. If defendants had owned a lease on an adjoining 80 acres, providing for unitization, the pooling could

have been had without any loss to defendants' interests. But Sun demanded a consideration of 1/16th of the gas produced from the unit. Defendants treated this item as an operating expense and gave Sun the 1/16th from its working interest. In other words, defendants bore the expense of acquisition of Sun's lease to perfect the necessary unit of 160 acres, while plaintiff's participation resulted from the unitization which he had authorized in the lease.

Judgment affirmed.

HALLEY, V. C. J., and WELCH, CORN, DAVISON, and JOHNSON, JJ., concur. O'NEAL and BINGAMAN, JJ., dissent.